**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


**UNITED STATES OF AMERICA,**

                          **Plaintiff,**                    **Crim. No. 04-80810**

**vs.**                                                **Hon. Gerald E. Rosen**

**TERENCE LAMAR CAMPBELL,**

                          **Defendant.**
_____/

**OPINION AND ORDER REGARDING DEFENDANT'S**
**MOTIONS TO DISMISS INDICTMENT AND TO SUPPRESS EVIDENCE**

                At a session of said Court, held in
                the U.S. Courthouse, Detroit, Michigan
                on _____November 30, 2007_____

                PRESENT:   Honorable Gerald E. Rosen
                                    United States District Judge

## I.  INTRODUCTION

Defendant Terence Lamar Campbell is charged, along with a co-defendant, Tony

Bennett, in a large scale, long-term drug distribution and money laundering operation.

The six-count indictment returned by the Grand Jury against Campbell and Bennett

specifically charges the two defendants with Conspiracy to Distribute and Possession

with Intent to Distribute Cocaine, Cocaine Base ("Crack"), Heroin, and MDMA [3, 4

Methylendedioxymethamphetamine] ("Ecstasy") (Counts One through Five); and Money

Laundering Conspiracy (Count Six).  The Indictment was filed under seal on September

1

29, 2004.  It was not unsealed until July 28, 2005.  Campbell was subsequently arrested

on April 6, 2006, and was arraigned on that same date.

This matter is presently before the Court on two motions filed by Campbell: (1) a

Motion to Dismiss based upon Pre- and Post-Indictment Delay and (2) a Motion to

Suppress Evidence and for an Evidentiary Hearing.[1]  During the course of four days of

proceedings on this matter, the Court heard the arguments of counsel and the testimony of

FBI Special Agent Stanley Christ; Sergeant Vincent Lynch and Sergeant Brent Miles of

the Oakland County Sheriff's Office; and Thomas Evans, the Assistant Director of the

Michigan State Police Criminal Records Division.  The Court also received into evidence

a number of exhibits.  Then, following the close of in-court proceedings, the Court

received additional documentary evidence.

Having heard and considered the testimony of the witnesses and the oral

arguments of counsel, and having reviewed and considered the exhibits submitted, the

Court is now prepared to rule on this matter.[2]  This Opinion and Order sets forth the

---

[1]  Campbell actually filed two separate motions captioned as motions to suppress: a
"Motion to Suppress and for Evidentiary Hearing," filed on August 4, 2006 [Dkt. # 34],
the same date on which the Motion to Dismiss was filed; and a "Motion to Suppress
Evidence and for *Franks* Hearing," filed on November 13, 2006 [Dkt. # 42].  Because
both motions seek the suppression of the same evidence, the Court deems the second
motion to be a supplement to the first motion and, accordingly, has consolidated the two
motions for purposes of its ruling.

[2]  Although this matter has been "under advisement" for a substantial length of
time, the Court needed this time to await the preparation and filing of all of the hearing
transcripts and to thoroughly consider the complex issues that arose as a result of the
unavailability of a transcript or tape of the telephonic hearing concerning the search

Court's rulings.

## II. **FACTUAL BACKGROUND**

On August 7, 2001, the FBI received confidential information that a privately-chartered jet (tail registration number N-600-XJ) was to arrive at the Pontiac-Oakland County Airport some time before noon the next day, August 8, 2001, and was to be carrying a large quantity of narcotics and/or a passenger who was coming to the Detroit area to set up a drug deal. FBI agents subsequently learned that the chartered jet was scheduled to arrive at the I.F.L. private terminal. Accordingly, they set up surveillance at the terminal.

At approximately 9:30 a.m. on August 8, 2001, the agents observed a limousine arrive at the I.F.L. terminal and park on the tarmac. Approximately an hour after the limo arrived, the agents observed a jet with tail registration number N-600-XJ land at the airport and taxi from the active runway directly to the I.F.L. terminal.

Once the jet came to a stop, agents observed the limo pull up to the jet. Shortly thereafter the agents observed an individual, later identified as Campbell's co-defendant,

---

warrant. The Court finds that the under these circumstances, the ends of justice are best served by suspending the 30-day "under advisement" maximum prescribed by 18 U.S.C. § 3161(h)(1)(J). See S. Rep. No. 212, 96th Cong., 1st Sess. 33-34 (1979); H. R. Rep. No. 390, 96th Cong., 1st Sess. 12 (1979), U.S. Code Cong. & Admin. News 1979, pp. 805, 816 (expressly indicating that "ends of justice" continuances can be employed by trial courts to increase their time to hold a matter "under advisement" beyond the 30-day maximum prescribed by section 3161(h)(1)(J)).

Tony Bennett,[3] deplane the jet where he was greeted by the limo driver. Thereafter, I.F.L. terminal personnel were seen removing two large, and apparently heavy, brown cardboard boxes from the jet and placing them in the limousine. In addition to the heavy cardboard boxes, the terminal personnel transferred various pieces of luggage from the jet to the limo. Thereafter, Tony Bennett entered the limousine.

Under surveillance by the agents, the limousine drove Bennett from the airport to a house located at 18712 Addison in Southfield, Michigan. Upon arrival at the house, the limousine backed into the driveway up to the garage door. There, Bennett waited for the arrival of another individual, later identified as Defendant Terence Campbell, to open the garage door. The limo backed into the garage and the suitcases and boxes were removed from the car and taken inside the residence.

Several hours later, Bennett and Campbell left the house and were followed by agents to various places in and around the metropolitan Detroit area before returning to the Addison Street residence. Later in the early evening, Bennett and Campbell again left the house and were followed to Brighton, Michigan before law enforcement personnel were forced to terminate their surveillance due to heavy traffic.

In the interim, Federal agents secured a search warrant for 18712 Addison.[4]

---

[3] Bennett had used one of his many aliases, Tony Jackson, in chartering the jet and the limousine.

[4] The issuance of the search warrant is the subject of Defendant's Motion to Suppress and is discussed in detail *infra* in Part III-B of this Opinion.

4

Property records had shown that this residence was owned by Defendant Campbell. At approximately 8:30 p.m., the agents executed the search warrant. At this time, the residence was unoccupied. Shortly after entering the residence, the agents discovered the implements associated with a large scale drug distribution organization.

In the basement, the agents found the two large cardboard boxes, stacked one on top of the other, along with several suitcases and duffle bags stacked in the corner. Upon peering into the opened top box, agents observed several individually wrapped "brick" packages. (Subsequent tests revealed these "brick" packages contained kilogram quantities of cocaine.) The bottom box was identical in size, shape and markings to the top box. This box likewise contained similar sized "bricks" of cocaine. A check of nearby suitcases also revealed additional quantities of cocaine "bricks."

A final count of the "brick" packages revealed that the boxes and suitcases contained 116 kilograms of cocaine. Agents also discovered other quantities of drugs including in excess of six ounces of cocaine base ("crack"), 375 grams of heroin, and several thousand pills of MDMA/ecstasy (655 grams). Additionally, the agents found various "tools of the trade" in the illegal distribution of drugs, including drug packaging material, digital and trible beam scales, two electronic money counters, a bullet proof vest, a number of firearms, and in excess of $10,000 in cash.

## III. DISCUSSION

## A.

## <u>MOTION TO DISMISS BASED ON PRE- AND POST-INDICTMENT DELAY[5]</u>

---

[5] In addition to seeking dismissal on the basis of delay in both the pre- and post-indictment phases of this case, Campbell also seeks dismissal based on the delay between the return of his indictment and its filing and unsealing. As the Court noted on the record during the in-court proceedings on this matter, the underlying premise of this aspect of Campbell's motion to dismiss is fundamentally flawed. Campbell's motion based on the delay between the return of his indictment and its filing was premised on his belief that the Grand Jury returned its indictment on September 29, **2001** -- the date appearing on the bottom of the last page of the indictment -- but that the indictment was not filed until September 29, 2004. Defendant theorizes in his motion that the Government deliberately delayed in filing the indictment against him for three years because Campbell's co-defendant was co-operating.

The text of the indictment, however, establishes that the "2001" date is simply a typographical mistake and that the indictment was filed on the same date that it was returned, September 29, 2004.

First, allegations within the Indictment itself reference dates of events that **post-date September 29, 2001.** For example, in the "Overt Acts" section of the Indictment, it is alleged in Paragraph 2:

> It was further part of the ways and means of this conspiracy that upon purchase of real estate from the State of Michigan during 1998 and 1999 the purchaser was advised to file the Quit Claim Deed with Wayne County, Registrar of Deeds to reflect the transfer and sale. **Various inquiries with Wayne County, Registrar of Deeds during August 2004** reveal that no Quit Claim Deeds were filed to reflect the purchase.

[Indictment, pp. 11-12.]

Further, in Paragraph 3 of that same "Overt Acts" section, the Indictment alleges:

> A. On February 24, 1999, Terence and Yvonne Campbell registered Wise Choice Realty & Investments, Inc. with the Michigan Department of Consumer Affairs. . . . The State of Michigan automatically dissolved Wise Choice Realty & Investments **on July 15, 2002** for lack of activity.

1.  **DISMISSAL FOR PRE-INDICTMENT DELAY**

The Fifth Amendment protects defendants against excessive or prejudicial pre-indictment delay. *See United States v. Lovasco*, 431 U.S. 783, 788, 97 S.Ct. 2044 (1977).  The test for unconstitutional pre-indictment delay is whether *both* (1) the delay caused substantial prejudice to the defendant's right to a fair trial, **and** (2) the delay was an intentional device by the government to gain a tactical advantage over the accused. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455 (1971); *United States v. Rogers*, 118 F.3d 466, 475-76 (6th Cir.1997); *United States v. Brown*, 959 F.2d 63, 66 (6th Cir.1992); *United States v. DeClue*, 899 F.2d 1465, 1469 (6th Cir.1990).

---

> B.  **On February 20, 2003**, Yvonne Campbell registered Top Notch Realty, LLC with the Michigan Department of Consumer Affairs. . .

[*Id.* p. 12.]

The Grand Jury could not have returned an indictment in 2001 based on factual allegations of events that did not occur until 2002, 2003 and 2004.  Furthermore, September 29, 2001 was a Saturday; grand juries do not normally meet on weekends. September 29, 2004, on the other hand was a Wednesday, a weekday.

Second, the "Request for Warrant Upon Indictment" for both Campbell's and Bennett's arrest and the indictment itself were sealed together and both warrant requests are dated September 29, 2004.

Based upon the foregoing, the Court finds that the 2001 date on the last page of the indictment is merely a typographical error and that the actual date that the indictment was returned is the date on which it was filed -- September 29, 2004.  Accordingly, to the extent that Defendant Campbell seeks dismissal based on the delay between the return of his indictment and its filing, there being no factual support for Defendant's claim, the Court will deny Defendant's motion.

Defendant Campbell contends that both prongs of the test are met here. First, Defendant argues that his right to a fair trial has been prejudiced because his mother, who is named as a co-conspirator in one count of the indictment, Count Six (the money laundering conspiracy), died on April 2, 2004, i.e.,six months before the indictment was filed and more than a year before he was ultimately arrested and arraigned on the indictment. Campbell maintains that his ability to present a defense as to Count Six has been prejudiced because if his mother were alive, she would have testified regarding her legitimate business transactions with her son.

As to the second prong, Campbell believes that his co-defendant, Tony Bennett, was co-operating with the Government and that the Government delayed in bringing its indictment to gain a tactical advantage by obtaining Bennett's willingness to testify against Campbell. Even assuming that Campbell has been prejudiced by the Government's failure to indict him sooner than it did, the facts do not bear out the contention that Bennett was cooperating with the Government prior to the September 29, 2004 filing of the indictment.

Rather than cooperating with the Government, Bennett, in fact, took numerous deliberate and intentional steps following the events of August 7-8, 2001 to evade the authorities. Using various aliases over the course of the ensuing 10 months,[6] Bennett left

---

[6] During this period, Bennett identified himself as "Gerald Hunter," "Tony Jones," "Vincent Perry," and "Lamar Carter." *See* Government's Response to Bennett's Motion for Review of Detention Order, pp. 6-9.

Michigan, traveled to California, then to Texas and Georgia. *See* Government's Response to Defendant Bennett's Motion for Review of Detention Order, pp. 6-9. It was not until he was finally arrested in Alabama in June 2002 on drug possession and false identification charges that authorities learned his true name, Tony Bennett. *Id.* at p. 9. A police LEIN search conducted after the Alabama arrest revealed that Bennett was wanted on an outstanding 2001California arrest warrant for dangerous drugs. *Id.* at pp. 9-10. He was extradited by California authorities and was sentenced to two years in state prison. *Id. See also,* 10/14/05 Northern District of Georgia Pretrial Services Report on Defendant Bennett. He served 14 months in prison and 15 months on parole in California. *Id.*

After he was released from California parole, Bennett moved to Atlanta, Georgia where, on October 12, 2005, he was arrested on the warrant issued in this case. *Id.* (The warrant, along with the indictment had only been unsealed two and a half months earlier.) Bennett made his initial appearance here on the indictment three weeks later, on November 9, 2005. *See* November 10, 2005 Eastern District of Michigan Pretrial Services Report. Defendant Campbell was arrested and arraigned on the indictment only a little over five months later, in April 2006. *See* Docket Minute Entry for Proceedings on April 6, 2006.

The sequence of events concerning Defendant Bennett from August 9, 2001 through November 9, 2005 demonstrates that there is no simply no factual merit to Defendant Campbell's contention that Bennett was cooperating with the Government and that the Government, therefore, intentionally delayed indicting him to gain a tactical

advantage over him.

Defendant further argues that it is unlikely that the delay between the August 8, 2001 drug seizure and the September 29, 2004 indictment can be attributable to investigative efforts, as the charged conduct in the indictment ended as of September 2001.

Again, the indictment itself does not bear out this contention. First, with respect to the drug conspiracy, the indictment charges that the drug trafficking took place in various states: California, Alabama, Nevada, Illinois, and Michigan. The fact that the indictment charges drug trafficking acts committed in California, Alabama, Nevada, Illinois, and Michigan from 1998 to September 7, 2001 does not mean that the Government knew about them all before September 29, 2004 (the date of the indictment). As indicated above, although it is now known from his criminal record that Defendant Bennett moved about the country and engaged in drug activities using a variety of aliases, various aliases that he was using when and under which he was charged in California and Alabama were **different aliases from those alleged in the indictment**. His true name, "Tony Bennett," did not come to light until some time after he was arrested in Alabama in the middle of 2002. It is, therefore, reasonable to conclude that the Government was continuing to "piece together" the various parts of drug trafficking conspiracy for some time after September 7, 2001.

Moreover, the fact that the Government was continuing with its investigative efforts after September 7, 2001 is readily evident from the face of the indictment. The

10

Money Laundering Conspiracy Count (Count Six of the Indictment) charges that

Defendant Campbell and his mother, purchased real estate using the names "Wise Choice

Management" and "Top Notch Realty," to conceal and disguise the ownership and source

of the funds used for the property purchases. The indictment itself shows that

investigation into Wise Choice Management's and Top Notch Realty's property

purchases continued into 2003 and 2004. *See* Indictment, pp. 11-12 where it is alleged

that in Paragraph 2 of the "Overt Acts" section:

> It was further part of the ways and means of this conspiracy that upon
> purchase of real estate from the State of Michigan during 1998 and 1999 the
> purchaser was advised to file the Quit Claim Deed with Wayne County,
> Registrar of Deeds to reflect the transfer and sale. **Various inquiries with
> Wayne County, Registrar of Deeds during August 2004** reveal that no
> Quit Claim Deeds were filed to reflect the purchase.

[Indictment, pp. 11-12.]

Paragraph 3 of that same "Overt Acts" section, the Indictment alleges:

> A.  On February 24, 1999, Terence and Yvonne Campbell registered
>     Wise Choice Realty & Investments, Inc. with the Michigan
>     Department of Consumer Affairs. . . . The State of Michigan
>     automatically dissolved Wise Choice Realty & Investments **on July
>     15, 2002** for lack of activity.

> B.  **On February 20, 2003**, Yvonne Campbell registered Top Notch
>     Realty, LLC with the Michigan Department of Consumer Affairs. . .

[*Id.* p. 12.]

Therefore, it can hardly be said that the Government's investigative efforts did not

continue after September 7, 2001.

For all of these reasons, the Court rejects Defendant's "pre-indictment" delay

argument.

## 2.    __POST-INDICTMENT DELAY__

The Sixth Amendment provides that in all criminal prosecutions, "the accused

shall enjoy the right to speedy and public trial."  U.S. Const. Amend. VI.  This guarantee

protects "at least three basic demands of criminal justice -- to prevent undue and

oppressive incarceration prior to trial; to minimize anxiety and concern accompanying

public accusation; and to limit the possibility that delay will impair the ability of an

accused to defend himself."  *Smith v. Hooey*, 393 U.S. 374, 377-78 (1969).

Sixth Amendment speedy trial protections are triggered by a defendant's "arrest,

indictment or other official accusation."  *See Doggett v. United States*, 505 U.S. 647

(1992); *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459 (1971) ("[I]t is

either a formal indictment or information or else the actual restraints imposed by arrest

and holding to answer a criminal charge that engage the particular protections of the

speedy trial provision of the Sixth Amendment.")[7]

Here, the Indictment charging Defendant Campbell with the drug and money

laundering conspiracies was issued on September 29, 2004.  This was the first time that

---

[7]  The cited cases make clear that to the extent that Defendant attempts to expand the protections afforded by the Sixth Amendment to encompass the time from the date of the offense, i.e., August 8, 2001, when the search of Defendant's premises uncovered the vast supply of drugs and firearms, this effort is without merit.  The Supreme Court has, in fact, expressly held that "the Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested, or otherwise accused."  *United States v. MacDonald*, 456 U.S. 1, 6 (1982); *see also United States v. Marion, supra.*

Defendant was first officially accused in this case. However, he was not arraigned and did not appear on the indictment until April 6, 2006, i.e., 18 months later.

The Supreme Court has articulated a four-part balancing test for courts to use in considering whether a defendant's constitutional right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) the prejudice suffered by the defendant as a result. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972). In *Doggett v. United States*, 505 U.S. 657 (1992), the Supreme Court reaffirmed the *Barker* test but stated the four criteria slightly differently, instructing courts to consider (1) whether delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for that delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as the delay's result. *Id.* at 651 (enumeration added). As the Court in *Barker* stressed, however, none of the four factors is necessary or sufficient in and of itself; rather, "they are related factors and must be considered together with such other circumstances as may be relevant." *Barker, supra*, 407 U.S. at 533. "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.*

The Court will, therefore, examine and balance the facts of this case in light of the *Barker/Doggett* factors.

Here, the length of delay is bounded by the date of the filing of the indictment on September 29, 2004, and the present time, approximately 37 months. The Supreme Court

13

in *Barker, supra*, found no constitutional violation even though the delay between the defendant's arrest and trial in that case was 5 ½ years, substantially longer than the complained of delay in this case. 407 U.S. at 533. *See also, United States v. Smith*, 94 F.3d 204, 212 (6th Cir.1996) ("[T]he presumptive prejudice arising out of the three-year delay in this case, if any, is negligible at best . . . .") Furthermore, the Sixth Circuit has held that the absence of a Speedy Trial Act violation weighs heavily against a finding of a violation of the Speedy Trial Clause of the Constitution. *See, United States v. DeJesus*, 887 F.2d 114, 116 n. 1 (6th Cir.1989) (refusing to consider constitutional claim where no Speedy Trial Act violation was found; "it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the Sixth Amendment right to speedy trial has been violated"). There is no Speedy Trial Act violation here.

18 U.S.C. § 3161(c)(1) provides that the trial of a defendant charged in an indictment shall commence within 70 days from the date that the defendant first appeared before a judicial officer. Here, as indicated, Defendant Campbell first appeared before the Magistrate Judge for his arraignment on April 6, 2006. Subsection (h) of § 3161, however, provides that certain periods of delay are excluded from the computation of time within which the trial must commence. Here, the Defendant stipulated to an "ends of justice" continuance following the May 5, 2006 change in AUSAs in this case, in accordance with § 3161(h)(8)(A), excluding from Speedy Trial Act computation all delay through September 26, 2006. Meanwhile, on July 31, 2006, Campbell filed the first of a series of pre-trial motions -- including the motions that are the subject of this Opinion and

14

Order -- tolling the running of the speedy trial clock until their resolution.

Applying the foregoing, the Court finds that the length of delay factor does not weigh heavily in favor of Defendant Campbell.

The second criterion, the reason for the delay, calls for a judicial assessment of relative blameworthiness. *See Doggett, supra; see also, Wilson v. Mitchell*, 250 F.3d 388, 395 (6th Cir. 2001) ("[T]he 22-year delay can be placed on both Wilson and the state. This inquiry, however, is not a search for a blameless party. We are instead concerned with who 'is more to blame for that delay.'")

It is the Government's burden to explain pre-trial delay. *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (citing *United States v. Graham, supra*, 128 F.3d at 374). However, as the Supreme Court explained in *Barker* "different weights should be assigned to different reasons" for the Government's delay:

> A deliberate attempt to delay trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily, but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 531 (footnote omitted).

Here, although the Government may be partially to blame for the delay, the record shows that Defendant Campbell is the more blameworthy party because Campbell took deliberate steps to avoid detection by federal agents. FBI Agent Stanley Christ and OCSD Seargent Vincent Price attempted to locate him following the issuance of the

15

indictment and conducted interviews with his relatives for that purpose. *See* Government's 9/26/06 Response Brief, p. 2. Defendant's aunt, Elaine Campbell, advised the agents in December 2005 that she had not seen her nephew since shortly before his mother's death in April 2004. *Id.* She informed the agents that Defendant Campbell had not even attended his mother's funeral and she had no idea where her nephew was residing since before April 2004. *Id.* It subsequently came to light that only a month before the indictment was unsealed in July 2005, Mr. Campbell had obtained a renewal of a false Michigan Driver's License in the name of "Dwayne Terry Thomas." *Id.*

Campbell's co-defendant Tony Bennett was arrested in October 2005, but Campbell remained a fugitive from justice, and was not arrested until April 2006 when he was detained by the Detroit Police Department during the execution of a search warrant for marijuana in an unrelated matter which turned up 1,600 pounds of the drug. *Id. See also*, 9/12/06 Pretrial Services Report. At the time of that state arrest, Campbell identified himself as "Dwayne Terry Thomas," and produced a Michigan Driver's License in that name. *Id.*

Additionally, as indicated above, the indictment which was issued on September 29, 2004, was sealed until July 28, 2005 to avoid jeopardizing an indictment in another huge narcotics trafficking case which involved 32 defendants engaged in drug trafficking activities in at least eight states.[8] *See* Government's Response Brief, p. 2; *see also*

---

[8] *See United States v. Quasand Lewis, et al.*, 05-80617.

9/29/04 Motion to Seal Indictment and Warrants. As explained in the Motion to Seal, the indictment and the warrant for Mr. Campbell's arrest were sealed specifically to insure against one or more persons involved in that other case from fleeing the jurisdiction and to protect against the possible destruction of evidence, as well as to protect potential government witnesses from harm. *Id.*

The foregoing makes clear that the Government's delay in arresting Defendant Campbell after the indictment issued had nothing to do with securing a deal with his co-defendant or to otherwise gain any advantage. Rather, the record shows that Campbell made a conscious attempt to avoid being discovered. He obtained false identification, cut himself off from his family, and moved from his home. Since Defendant was in hiding, there can be no argument that the delay in his arrest was due only, or even primarily, to the fault of the Government. Therefore, the second factor *Barker/Doggett* factor weighs heavily against Defendant.

The third factor is whether and how promptly and forcefully the defendant asserted his right to speedy trial. Campbell first asserted his right to a speedy trial by filing the instant motion to dismiss on August 4, 2006, i.e., four months after he was arraigned on the indictment and a little over a month after the Court entered its "ends of justice" continuance. This is a sufficiently timely assertion of his right, and accordingly, this factor weighs in favor of Defendant.

The final *Barker* factor to be considered is whether Defendant has been prejudiced by the delay. Prejudice is determined by examining such factors as whether the defendant

17

has suffered (1) oppressive pretrial incarceration; (2) undue anxiety and concern; or (3) impairment to his defense. *Barker*, 407 U.S. at 532. Here, Defendant argues "impairment of his defense" because his mother died in the period between the time of the discovery and seizure of the drugs and guns in his home and the date of the indictment. Mrs. Campbell's death, however, cannot serve as a basis for *post*-indictment delay prejudice because she died five months *before* the indictment issued. Therefore, this factor weighs against Defendant.

The timely of assertion of his speedy trial right being the only factor weighing in Defendant's favor, Defendant's motion to dismiss based on post-indictment delay must fail.

For all of the foregoing reasons, Defendant's Motion to Dismiss Indictment Based on Pre- and Post-Indictment Delay will be denied.

## B.

## DEFENDANT'S MOTION TO SUPPRESS

Defendant Campbell's second motion seeks suppression of the evidence seized during the search of his house at 18712 Addison in Southfield, Michigan.

During the course of pre-trial discovery in this matter, Campbell's attorney requested that the Government provide him with a copy of the search warrant affidavit.[9] Defense counsel, however, was informed that no recording of the telephonic affidavit

---

[9] The warrant itself was turned over to defense counsel, but not the warrant affidavit.

existed. He was later further informed that there were no available notes from the officers and agents who executed the search warrant. Because Fed. R. Crim. P. 41(d)(3) requires that the issuing magistrate judge make a verbatim record of a telephonic warrant request, either electronically, stenographically or in writing, and because no recording exists in this case, Campbell argues that all evidence seized during the search should be suppressed.

### *Pertinent Facts*[10]

The application for the search warrant was made by FBI Special Agent Stanley Christ to Magistrate Judge Steven Pepe on August 8, 2001. Christ testified that he and another Task Force member, Sergeant Brent Miles of the Oakland County Sheriff's Department, worked together on the search warrant affidavit. Christ testified that they originally had thought that the warrant request would be made to a state judge. Hence, Miles started drafting the warrant application in the form used by Michigan courts. However, while Miles was in the course of drafting his warrant affidavit, Agent Christ consulted with Ronald Waterstreet, the Assistant U.S. Attorney assigned to the case, who decided that they should obtain a federal search warrant, instead.

AUSA Waterstreet and Agent Christ telephoned Magistrate Judge Steven Pepe, who was the duty magistrate that date, at approximately 3:30 or 4:00 p.m. They advised

---

[10] The following factual recitation is taken from the testimony taken by the Court relative to Defendant's Motion to Suppress on September 13, September 29, November 17, 2006 and May 22, 2007.

the Magistrate Judge that they were going to be seeking a federal search warrant and offered to drive from Detroit to Ann Arbor to make their application. Magistrate Judge Pepe told them that would not be necessary because they could do a telephonic affidavit.

Christ testified that after Magistrate Judge Pepe made that suggestion, they terminated the telephone call to allow Christ and Waterstreet time to outline the probable cause for the warrant. Christ then wrote some notes on a yellow legal pad. Armed with these notes and the draft affidavit prepared by Sergeant Miles, at approximately 6:00 p.m., Christ and Waterstreet called Magistrate Judge Pepe back and Christ made a presentation to the Magistrate Judge as to the basis of what he believed was the probable cause for the authorization of a search of the Addison Street residence.

Christ testified that he verbally provided the Magistrate Judge with the information reflected in his notes and in Sergeant Miles draft affidavit as well as some additional information that was not written down. According to Christ, after he made his presentation, the Magistrate Judge indicated that he was satisfied that there was probable cause to authorize the search warrant for the premises and instructed Christ to sign his name on the warrant form. Christ accordingly signed the duplicate warrant, certifying that Magistrate Judge Pepe orally authorized its issuance and execution on August 8, 2001 at 6:36 p.m. Magistrate Judge Pepe later placed his original signature on the warrant, indicating in writing immediately before his signature that "The following findings were made on the tape recorded telephonic record on August 8, 2001," which he wrote above the following printed paragraph:

I am satisfied that the circumstances are such as to make it reasonable to dispense with a written affidavit and that there is probable cause to believe that the property or person so described is concealed on the person or premises above described and that grounds for application for issuance of the search warrant exist as communicated orally to me in a sworn statement which has been recorded electronically, stenographically or in long-hand and upon the return of the warrant, will be transcribed, certified as accurate and attached hereto.

After the warrant was issued, AUSA Waterstreet and Agent Christ requested that it and the warrant affidavit be sealed immediately. Magistrate Judge Pepe granted that request. Christ testified that at some point in time in 2004, it was discovered that the tape of the August 8, 2001 telephonic affidavit (or the transcription of the tape) was missing.

Shortly after Defendant Campbell filed his motion to suppress, Magistrate Judge Pepe was interviewed on September 6, 2006 concerning the circumstances of his issuance of the warrant in this case, and an FBI 302 interview record was prepared and turned over to the Defense. Magistrate Pepe stated, however, that he has no independent recollection of the making of the telephonic warrant application on August 8, 2001. [*See* FBI 302 of 9/6/06 interview with Magistrate Judge Steven D. Pepe, conducted by FBI Special Agent James Brennan.] The Magistrate Judge indicated that approximately five to seven percent of all of the warrant applications he reviews are completed by telephone in lie of a prepared paper affidavit. *Id.*

Magistrate Judge Pepe stated that his normal routine when a telephonic warrant is sought is to speak with both the Agent and the AUSA, if the AUSA is available. *Id.* He said that he then activates the recording equipment and places the Agent under oath. *Id.*

He further stated that he normally would require the Agent to fax or e-mail him any notes or documents the Agent would use to support the facts and circumstances in the oral presentation. *Id.* In this case, however, Magistrate Judge Pepe stated that he was uncertain if he received any material (or whether such material exists), because he has no independent recollection of the matter. *Id.*

Magistrate Judge Pepe further indicated that he would take a statement from the Agent to establish probable cause for a search warrant. *Id.* This would have required him to read into the record a finding, and upon making a finding of probable cause, he would instruct the Agent to fill out the warrant forms and have the Agent sign his name and add a "slash" (/) and his own initials following. *Id.* He would also instruct the Agent to note on the warrant the time that this was done, as well as sign the certification. *Id.* He would sign an original warrant, and place it, along with the cassette tape of his telephone conversation with the Agent which he labels, on the chair in his office where it would be easily noticed the following day, or leave the tape and original warrant on the desk of a Deputy Clerk. *Id.*

With respect to telephonic warrant applications made during the late summer - fall of 2001, he stated that he would have instructed one of his clerks in Ann Arbor to forward the tape to Mary Vozniak, a duty clerk he shared with Magistrate Judge Virginia Morgan in Detroit. *Id.* He said that Mary would then forward the tape to be transcribed to Theresa Hryshko, the supervisor of court reporting. *Id.* Magistrate Judge Pepe noted that a number of his civil tapes in August-September 2001 are missing but this is the only

criminal tape he is aware of that could not be located, and he only became aware of this fact on or about August 22, 2006, when he received a phone call from Agent Christ inquiring about the matter. *Id.* He added that all of his criminal tapes would be kept in Detroit, in the Clerk's Office. *Id*.

The Clerk's office has advised the Court and the parties that normally tapes of telephonic warrant affidavits would be sealed in the envelope with the sealed warrant. However, in this case no tape was found in the sealed warrant envelope. The sealed envelope maintained by the Clerk's office for sealed material concerning this matter, is dated and stamped "August 8, 2001," and contains only (1) an order to seal the search warrant affidavit dated August 8, 2001 and signed by Magistrate Judge Pepe; (2) a motion to seal the search warrant affidavit made by Assistant U.S. Attorney Wayne Pratt, dated August 8, 2001; and (3) the search warrant application and affidavit signed by Magistrate Judge Pepe and Agent Christ. The August 8, 2001 proceeding was either not recorded by the Magistrate Judge or it has been lost; it is not clear which is the situation.

1.      **A VIOLATION OF FED. R. CRIM P. 41(d)(3) IS NOT A BASIS FOR SUPPRESSION OF THE EVIDENCE.**

As indicated, Defendant Campbell argues for suppression of evidence based upon the apparent violation of Fed. R. Crim. P. 41(d)(3), the rule governing the issuance of a telephonic search warrant. Rule 41(d)(3) provides:

**(3) Requesting a Warrant by Telephonic or Other Means**

**(A) In General.** A magistrate judge may issue a warrant based on information communicated by telephone or other reliable electronic means.

**(B) Recording Testimony**.  <u>Upon learning that an applicant is requesting a warrant under 41(d)(3)(A), a magistrate judge must:</u>

> (i) place under oath the applicant and any person on whose testimony the application is based; and

> (ii) <u>make a verbatim record of the conversation with a suitable recording device, if available, or by a court reporter, or in writing</u>.

**(C) Certifying Testimony**.  <u>The magistrate judge must have any recording or court reporter's notes transcribed, certify the transcription's accuracy, and file a copy of the record and the transcription with the clerk.  Any written verbatim record must be signed by the magistrate judge and filed with the clerk.</u>

**(D) Suppression Limited**.  Absent a finding of bad faith, evidence obtained from a warrant issued under Rule 41(d)(3)(A) is not subject to suppression on the ground that issuing the warrant in that manner was unreasonable under the circumstances.

Fed. R. Crim. P. 41(d)(3).

Subsection (e)(3) of Rule 41 provides additional specific procedures applicable to

the issuance of telephonic warrants:

**(3) Warrant by Telephonic or Other Means**.  If a magistrate judge decides to proceed under Rule 41(d)(3)(A), the following additional procedures apply:

> **(A) Preparing a Proposed Duplicate Original Warrant**.  The applicant must prepare a "proposed duplicate original warrant" and must read or otherwise transmit the contents of that document verbatim to the magistrate judge.

> **(B) Preparing an Original Warrant**.  If the applicant reads the contents of the proposed duplicate original warrant, the magistrate judge must enter those contents into an original warrant.  If the applicant transmits the contents by reliable electronic means, that transmission may serve as the original

24

warrant.

> **(C) Modifications**. The magistrate judge may modify the original warrant. The judge must transmit any modified warrant to the applicant by reliable electronic means under Rule 41(e)(3)(D) or direct the applicant to modify the proposed duplicate original warrant accordingly.

> **(D) Signing the Original Warrant and the Duplicate Original Warrant**. Upon determining to issue the warrant, the magistrate judge must immediately sign the original warrant, enter on its face the exact date and time it is issued, and transmit it by reliable electronic means to the applicant or direct the applicant to sign the judge's name on the duplicate original warrant.

Fed. R. Crim. P. 41(e)(3).

There is no dispute in this case that the warrant itself was issued and a copy has been turned over to defense counsel. [*See* Defendant's Motion to Suppress, p. 2.]. Defendant's argument, however, focuses not on the warrant, but rather on the "telephonic affidavit" made to support the request for the warrant and the procedures followed by the Magistrate Judge.

It is Defendant's position that because it appears that no recording or transcription of telephonic warrant was made or retained, Rule 41 has been violated and suppression of the evidence of the search is, therefore, warranted. Sixth Circuit law, however, holds otherwise.

*United States v. Chaar*, 137 F.3d 359 (6th Cir. 1998), presents a substantially similar situation to that presented in this case. In *Chaar*, the defendant was charged with possession of contraband cigarettes and aiding and abetting his coconspirator. The

charges against Chaar arose as a result of an anonymous tip received by the Detroit office of the FBI around noon on September 22, 1994 telling the FBI that Chaar and an associate named Jamil would be bringing a shipment of cigarettes in from Kentucky some time before 4 p.m. that day and that they would take them in a truck to a storage facility on 23 Mile Road, between I-94 and Gratiot. The FBI passed the information along to the Bureau of Alcohol, Tobacco and Firearms (ATF). The ATF agent (Agent Krappmann) was subsequently informed by two other agents that a check with the storage facility revealed that Chaar leased two storage locker there and that Chaar had told the rental agent that he worked for a gas station and would be using the storage locker to store excess cigarettes. The ATF agent then contacted the U.S. Attorney's office in Detroit to arrange for a telephonic search warrant.

At 4:50 p.m. on September 22, the ATF agent, the AUSA and Magistrate Judge Lynn Hooe had a conference call. According to an affidavit later filed by Agent Krappmann, the call was tape recorded. According to the boilerplate language of the warrant form, the ATF agent was placed under oath. The agent and Magistrate Judge Hooe filled out identical warrant forms in an identical manner. Magistrate Judge Hooe determined that there was probable cause to believe that contraband cigarettes were being stored at Chaar's storage lockers at the storage facility and authorized the warrant. The magistrate judge further authorized the agent to sign his name to his copy of the warrant form. Federal agents subsequently executed the warrant and seized from the storage lockers 687 cartons of cigarettes that lacked Michigan tax identification.

Chaar was indicted for possession of contraband cigarettes in violation of 18

U.S.C. § 2342(a) and for aiding and abetting a co-conspirator in violation of 18 U.S.C. §

2(a).  He moved to suppress the incriminating evidence but the district court rejected that

motion.  Thereafter, Chaar entered a conditional plea allowing him to appeal the denial of

the motion to suppress.

On appeal, Chaar argued that the evidence obtained pursuant to the search warrant

should have been suppressed because the recording of the telephonic conference (and the

transcript, if one was ever made) was lost.  No duplicates were made, and so, Chaar

argued that the court had no basis to review the warrant for probable cause.

Although the government admitted in *Chaar* that the requirements of Rule 41 were

violated, the Court of Appeals concluded that this violation of the rules had no effect on

the admissibility of the evidence.  The Court explained:

> Initially, we note that as a matter of placing blame, this case is a poor
> candidate for suppression of the evidence.  "[T]he exclusionary rule is
> designed to deter police misconduct rather than to punish the errors of
> judges and magistrates." *United States v. Leon*, 468 U.S. 897, 916, 104
> S.Ct. 3405, 3417, 82 L.Ed.2d 677 (1984).  We do not exclude evidence,
> absent constitutional violations, unless the exclusion furthers the purpose of
> the exclusionary rule, *id.* at 918, 104 S.Ct. at 3418, and ***it was Magistrate
> Judge Hooe's error (not any misconduct by Officer Krappmann) that
> deprived us of both tape and transcript.  Therefore, on the facts of this
> case, exclusion is an inapt remedy***.
>
> The disposition of this Rule 41(c)(2)(D) [now, Rule 41(c)(3)][11]
> violation is a matter of first impression in this circuit.  Most Rule 41(c)[(3)]

---

[11] Rule 41 was reorganized in 2002 "to make it easier to read and apply its key provisions."  Fed. R. Crim. P. 41, Advisory Committee Notes, 2002 Amendments.

cases, in this and other circuits, have dealt with the oath requirement, which is not at issue here. . . .  Outside of the oath context, two other circuits have considered failures of the recording and transcription requirements. . . .  In *United States v. Richardson*, 943 F.2d 547, 549 (5th Cir. 1991), the Fifth Circuit held that in the absence of a recording or transcript, a warrant does not merit a presumption of regularity.  Nevertheless, the court held that it was appropriate for a reviewing court to use extrinsic evidence to examine the circumstances surrounding the issuance of the warrant.  *Ibid.*

The Ninth Circuit has held that

unless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression only where,

(1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or
(2) there is evidence of intentional and deliberate disregard of a provision of the Rule.

*United States v. Stefanson*, 648 F.2d 121, 1235 (9th Cir. 1981).

We agree with both of these rulings in the following senses with respect to Rule 41(c)[(3)].  First of all, although the evaluation of a warrant after a violation of Rule 41(c)[(3)] must be searching and skeptical (the Rule is, after all, designed to preserve evidence for reviewing courts), district courts are well-equipped to weigh any evidence that is available after the fact, and defendants can both contest the evidence through cross-examination and submit their own evidence.  Furthermore, suppression is an appropriate remedy only when the violation is either of constitutional dimensions (*i.e.*, the search became constitutionally unreasonable), is prejudicial, or is intentional.

None of these three bases for suppression apply here.  First, as will be discussed below, the search was not unconstitutional *per se*.  Second, Chaar has given us no basis to conclude that absent the violation, the search would have been less abrasive or would not have occurred.  Third, Chaar has not alleged, let alone shown evidence, that the violation was intentional. Although we can imagine cases in which a Rule 41(c)[(3)] violation would meet our criteria, we reject more than mere conjecture to suppress evidence.

We acknowledge that neither we nor Chaar have any way now of knowing what the magistrate judge knew when he issued the warrant. Not even the original tip sheet is part of the record -- the only evidence from which we can evaluate the sufficiency of the evidence underlying the warrant is Krappmann's affidavit, which was prepared nineteen months after the events it described. Given this epistemological problem, we are less than enthusiastic about affirming this search. However, Chaar gives us no evidence to support a decision to suppress it.

Chaar has the burdens of production and persuasion in seeking suppression of the evidence. [Citations omitted.] As such, the fact that there was no testimony to refute Krappmann's testimony, from either Magistrate Judge Hooe, [AUSA] Oberg or anyone else present in the courthouse when the warrant was issued, redounds to Chaar's detriment. Chaar was free to call any or all of these people as witnesses; he may well have believed that such testimony would not be helpful to him, and we will not strain to disagree. Furthermore, despite having a full and fair opportunity to cross-examine Krappmann at the suppression hearing, Chaar did not challenge the validity of Krappmann's oath or question Krappmann's version of the events surrounding the search and arrest. Chaar also made no attempt to show that he was prejudiced by the Rule 41(c) violation, and adduced no evidence to suggest that Krappmann's account was incorrect or that the tape and transcript had been lost intentionally. Therefore, we will not suppress this evidence merely on the basis of the Rule 41 violation.

137 F.3d at 361-63 (emphasis added; footnotes omitted).

As in *Chaar*, in this case, it was either the Magistrate Judge's failure to record the telephonic hearing or a court clerk's error that deprives the Court of a tape and transcript of the warrant application and affidavit. However, there is nothing of record to suggest that the failure to insure the retention of the recording of the warrant hearing was intentional.[12] Just as in *Chaar*, Defendant Campbell has not shown that under the

---

[12] Although the Court finds nothing in the record to suggest any intentional act on the part of Magistrate Judge Pepe or any other court employee, the Court is extremely displeased with the sloppiness with which the Magistrate Judge and/or the court staff

circumstances presented here, the search was unconstitutionally unreasonable or that it would not have taken place if Rule 41 had not been violated.

With regard to whether there was probable cause to support the issuance of the search warrant (and the constitutionality of the search), as the Sixth Circuit made clear in *Charr*, and the Fifth Circuit in *Richardson*, it is appropriate for the Court to rely on extrinsic evidence to examine the circumstances surrounding the issuance of warrant and the content of the telephonic affidavit made in support thereof. *Cf., United States v. Lambert*, 887 F.2d 1568, 1571-72 (11th Cir. 1989) ("[T]he absence from the court records of an affidavit constitutes some evidence that one did not exist. . . . However, other evidence may be presented to establish the fact that an affidavit was presented, as well as its contents"); *United States v. Pratt*, 438 F.3d 1264, 1270 (11th Cir. 2006) (when a warrant is not in evidence at a suppression hearing, a prosecutor may present other evidence to establish the warrant's exact language describing the place to be searched and the persons or items to be seized).

Here, using such extrinsic evidence based upon the testimony and supporting documentation reviewed by the Court, the Court is able to decide whether the warrant was supported by probable cause. As discussed below, although the Court's review is

---

apparently handle such important materials. The safekeeping of court records -- particularly where, as here, the record could potentially impact on constitutional rights of an accused -- should be of paramount concern to all court personnel. To simply leave a tape recording on a chair or on a clerk's desk after hours and keep no record of its disposition thereafter cannot be condoned and is not acceptable.

certainly made more problematic by the Magistrate Judge's failure to either record the proceeding or if he did, to insure the filing of a transcript and Agent Christ's telephonic warrant application and affidavit, these deficiencies are not sufficient for Defendant Campbell to prevail on his suppression motion.

## 2. SUFFICIENT PROBABLE CAUSE EXISTED FOR THE ISSUANCE OF <u>THE WARRANT.</u>

Guided by *Chaar*, the Court took testimony and evidence over the course of four days of proceedings.[13]  The Court now turns to an examination of the testimony and evidence to independently determine whether the warrant issued by Magistrate Judge Pepe was supported by probable cause.

FBI Special Agent Stanley Christ testified that he was the agent who made the telephonic warrant application to Magistrate Judge Pepe.  In August 2001, Christ was assigned to the Troy, Michigan FBI office and at the time was working with Oakland County Narcotics Enforcement Team, a joint federal and state narcotics investigation unit.  He testified that on August 7, 2001, Rick Solomon, another FBI agent in the Troy office, received a phone call from a Los Angeles FBI agent, Mitch Holmes, who indicated that the Los Angeles office had received information from a confidential informant that there may be a large amount of cocaine coming into the Oakland County Airport the

---

[13]  The evidentiary hearing which was commenced on September 13, 2006 was not concluded until May 22, 2007.  Two interim hearings were held on September 29 and November 17, 2006, following which the Court ordered the production of additional documentary evidence to the Court to insure that it had before it all possible evidence from which to reconstruct the events and make a probable cause determination.

following day on a private jet with the tail number N-600-XJ. Agent Solomon, in turn, passed the information on to Agent Christ. Based upon this information, Christ and other members of the Oakland County Narcotics Enforcement Team set up a physical surveillance at the airport.

As indicated by the confidential informant, the plane described by Agent Holmes arrived at Oakland County Airport the next morning, August 8, 2001. After its arrival, while other members of the team continued surveillance, Christ personally contacted LA Agent Holmes to ascertain the veracity and credibility of the informant who had provided Holmes the information about the suspected transportation of cocaine. Christ testified that Holmes told him that the source had been an informant for a period of time and had provided credible and reliable information in the past. Specifically, Holmes advised Christ that the informant was the owner of the charter airline company that owned the plane that was suspected of carrying the cocaine and that two or three months earlier, this same informant had provided information which led to the seizure of 42 kilos of cocaine in Atlanta, Georgia. Christ testified that Holmes also told him that the charter of the plane to Atlanta was an "identical deal" to the one involving the flight to Michigan -- a group of people leased the plane, paying for the lease up front with a large amount of cash to travel in a two-day time frame. However, other than the similarity of circumstances, Holmes did not convey to Christ that it was the same people who leased the two planes.[14]

_____

[14] In the notes which Christ testified he made before making his telephonic presentation to Magistrate Judge Pepe, Christ seemed to indicate that Solomon had told

Holmes added that his informant told him that his pilots had advised him that the individual who leased the plane to Michigan had told them that boxes they were transporting contained computer parts, but based on his past experience in the charter airline business, he believed they contained narcotics.

Meanwhile, as indicated, the surveillance team observed the plane that was described by the informant land at the Oakland County Airport and go into the I.F.L. hanger. A large, black male got off the plane, and with the assistance of airport personnel, unloaded two boxes and a couple of pieces of luggage, and, then loaded this cargo into a limousine.

Christ testified that the limousine was then followed to a residence located at 18712 Addison in Southfield, Michigan where it backed into the garage and unloaded. Christ testified that his partner on the Oakland County Narcotics Enforcement Team, Vince Lynch, then conducted a number of computer checks concerning the Addison Street residence and its owner. According to Christ, the residential property records established that the Addison Street residence was owned by Defendant Campbell. Christ, Lynch and Sergeant Brent Miles, another Task Force member who worked on the case, all testified that a criminal history check revealed that Campbell had a previous narcotics conviction in the past. (Both Lynch and Miles testified that they each independently did the criminal history checks and conveyed the information they learned to Agent Christ.) This criminal history check was verified by documents produced by the Michigan State Police and confirmed by Thomas Evans, the Assistant Director of the State Police

_____

him that his informant said it was the same individual who leased both planes.

Department's Criminal Records Division.

Christ also testified that when the surveillance team following the limo arrived at the residence, there was another vehicle parked in the driveway of the Addison Street residence. A check revealed that the vehicle was registered to a Willie Hamby. Sergeant Miles also did a computerized criminal history on Mr. Hamby which showed that Hamby also had a prior conviction for narcotics.

Christ further testified that later in the day, members of the surveillance team observed Campbell and the man who had deplaned from the airplane (later identified as Co-Defendant Tony Bennett) leave the Addison residence and they were followed by members of the surveillance team as they traveled to several places in and around Detroit.

Based upon the foregoing information, Christ said a decision was made to obtain a search warrant to search the Addison Street residence. Although initially a decision was made to obtain a search warrant through the state court, after a rough draft of a state warrant application had been made, the Assistant U.S. Attorney assigned to the case decided to proceed instead with an application for a federal warrant. A telephonic application was made to United States Magistrate Judge Steven Pepe at approximately 6:00 p.m. on August 8th.

Christ testified that in making his telephonic warrant application, he relied upon the draft of the state warrant application prepared by him and Officer Brent Miles, another Task Force member, some of his own handwritten notes and some information that he had not recorded. The draft state warrant application and Christ's notes were admitted into evidence. Agent Christ testified that this written information, as well as

34

some information that was not recorded in writing (i.e., information concerning the criminal history checks done on Campbell and Hamby) were conveyed to Magistrate Judge Pepe in making his telephonic warrant application.

The written documents reflect, and Agent Christ confirmed, at least one significant discrepancy as to one particular piece of information conveyed to Magistrate Judge Pepe concerning information originally provided by Los Angeles FBI Agent Holmes which was not verified by Agent Christ in his subsequent conversation with Holmes. Specifically, in making the telephonic warrant application, Christ told Magistrate Judge Pepe that Agent Solomon had told him on August 7th that Los Angeles Agent Holmes's informant had said that the same person who leased the plane to Oakland County had also leased the plane that had gone to Atlanta. Christ did not, however, tell Magistrate Pepe that Holmes had not told him that it was the same person who had leased the two planes when he personally spoke with Holmes on August 8th.

As indicated, Defendant Campbell seeks suppression of the evidence obtained as a result of the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978), arguing that false statements in the indictment render it invalid. In addition to leading Magistrate Judge Pepe to believe that the person on the airplane which arrived in Michigan on August 8, 2001 was the same person involved in the Atlanta seizure in May 2001 which resulted in the seizure of 40 kilos of cocaine, Campbell also argues that Christ misled the Magistrate Judge in stating that there was an "ongoing" narcotics investigation of Mr. Campbell's house when the investigation of the house only been "ongoing" for some ten hours, since the morning of August 8.

The first step in a *Franks* analysis is to determine whether "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit[.]" *Franks*, 438 U.S. at 155-56. Mere inadvertence or negligence, however, is insufficient to require exclusion. *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002). If the affidavit is found to contain false statements knowingly or recklessly made, then the next step in the analysis is to determine "with the affidavit's false material set to one side," whether "the affidavit's remaining content is insufficient to establish probable cause[.]" *Franks*, 438 U.S. at 156. It is only if the affidavit, minus any recklessly or intentionally and materially false statements no longer establishes probable cause, that the court must hold the search warrant invalid and the evidence obtained must be suppressed. *Id.*

Having reviewed and considered the testimony and evidence presented in this case, the Court finds that the only arguably materially false statement made by Agent Christ in making his telephonic warrant affidavit that may be viewed as having been recklessly made is the statement that the person on the airplane which arrived in Michigan on August 8, 2001 was the same person who arrived on the plane in Atlanta in May 2001.[15] Although this information would certainly have added additional support for a probable cause finding, the Court finds that even setting aside this "tainted" information, there remains sufficient corroborated -- and undisputed -- substantive information in Christ's telephonic warrant affidavit to have supported a finding of probable cause by the

_____

[15] The Court finds Christ's representation of an "ongoing" investigation of the Addison Street residence not to have been materially false and not recklessly made.

Magistrate Judge.

First, but for Christ's explanation as to why he did not bring to Magistrate Judge Pepe's attention the fact that Agent Holmes had only told him that the Atlanta airplane leasing transaction was an "identical deal" to the Michigan transaction, not that the planes were leased by the same individual, the Court fully credits Agent Christ's testimony concerning the events of August 7-8, 2001, particularly in light of the wholly corroborative testimony of Officers Lynch and Miles, who were also involved in the investigation, and the corroborative evidence of the computerized criminal history checks and the explanatory testimony of Thomas Evans, which the Court also credits.

To demonstrate probable cause to justify the issuance of a search warrant, the affidavit, without consideration of any tainted information, must contain facts that indicate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir.2005) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir.1990)). This conclusion depends on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317 (1983).

Stripped of the tainted information, the Court finds that Agent Christ's telephonic warrant affidavit contained a sufficiently particularized account of facts and circumstances that amount to a "fair probability" that evidence could be found in the Addison Street residence including: (1) the suspicious nature of the leasing of the aircraft -- short notice for a two-day travel window and a substantial amount of money paid in cash to transport "computer parts" when shipment for such items could certainly have

been done for substantially less money with common carriers than by leasing a private aircraft and flying into Detroit with the two boxes; (2) information concerning similar circumstances of the leasing of another plane with the same company that led to the seizure of a substantial quantity of drugs; (3) delivery of boxes ostensibly containing "computer parts" by limousine to a private residence owned by an individual who had been previously convicted on a narcotics charge; (4) the presence in the driveway of the residence at the time of delivery of a vehicle registered to another individual who also had a previous narcotics conviction; and (5) the fact that the Addison home was owned by another person who also had a drug-related conviction.

Considering the totality of these circumstances, the Court finds that Agent Christ's telephonic affidavit, expunged of the tainted information, provided sufficient probable cause for the warrant. Therefore, Defendant Campbell's motion to suppress and for a *Franks* hearing will be denied.[16]

---

[16] The Court notes that after hearing the testimony of four witnesses and reviewed numerous related documents, the Court has effectively conducted a *Franks* hearing in that it gave all parties, both the Government and the Defense, the opportunity to call any relevant witnesses they desired, and the Court heard and considered all of this relevant evidence. A *Franks* hearing would have added little or nothing.

## <u>CONCLUSION</u>

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant Campbell's Motion to Dismiss [Dkt.

No. 33] and Motions to Suppress Evidence and for an Evidentiary/*Franks* Hearing [Dkt.

Nos. 34 and 42] are DENIED.


                    <u>s/Gerald E. Rosen</u>
                    Gerald E. Rosen
                    United States District Judge

Dated:  November 30, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record
on November 30, 2007, by electronic and/or ordinary mail.

                    <u>s/LaShawn R. Saulsberry</u>
                    Case Manager